No. 19-mj-4148, 4149, 4152-DHH

### AFFIDAVIT

I, Special Agent David F. Simmons, depose and state as follows:

1.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since 2015.  I am currently assigned to the Boston Field Division's Bridgewater Field Office in Bridgewater, Massachusetts, and was previously assigned to the Miami Field Division in Doral, Florida.  Prior to becoming a Special Agent with ATF, I was employed as a Police Officer within the Commonwealth of Massachusetts for approximately nine years.  During this time, I spent approximately one year as a detective, where I investigated various offenses, including narcotics offenses, and received training in conducting advanced criminal investigations.

2.     As a Special Agent for ATF, some of my duties include: conducting criminal investigations into cases of illegal possession/transfer of firearms, firearms trafficking, and violent crimes involving firearms and narcotics trafficking.  Through my training, knowledge, and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the use and trafficking of illegal firearms.  I have been the affiant on numerous affidavits in support of federal and state search warrants, arrest warrants, and other applications.  I have participated in and performed surveillance and made arrests of firearm and narcotics traffickers who utilize their electronic devices to further their illegal activity.  During the course of my professional experience, I have interviewed numerous defendants, witnesses, victims, confidential informants, and other police officers regarding the illegal trafficking of firearms and narcotics.

3.     I submit this affidavit in support of application for a search warrant to obtain historical cell site information for one phone number. In particular:

1

     a. Information associated with a cellular telephone assigned call number 617-602-9101 ("Target Phone 4"), that is stored at premises controlled by T-Mobile US, Inc., located at 4 Sylvan Way, Parsippany, New Jersey 07054, for a period of January 1, 2019 through February 1, 2019.

4.    Target Phone 4 is specifically described in Attachment A-1 along with the information to be seized described in Attachment B-1.

5.    I also submit this affidavit in support of a search warrant to seize and search records and data from the Google account DIORMAURICECARTER@GMAIL.COM, Google Account ID: 20023072620 (the "Target Account") maintained by Google LLC ("Google"), which, government databases indicate, accepts service of process at: 1600 Amphitheatre Parkway, Mountain View, California 94043 and via the website https://support.google.com/legal-investigations/contact/LERS as described in Attachment A-2. There is probable cause to believe that the Target Account contains evidence, and instrumentalities of violations of 18 U.S.C. § 1951(a), through the commission of a robbery that affected interstate commerce and conspiracy to commit that offense, as described in Attachment B-2. Additionally, there is probable cause to believe that the Target Account contains evidence as to the current and historical whereabouts of DIOVANNI CARTER, one of the suspects of the underlying robbery.

6.    I also submit this affidavit in support of an application to search the premises of 82 Carl Avenue, Brockton, MA ("82 Carl Avenue"), as further described in Attachment A-3. There is probable cause to believe that 82 Carl Avenue contains evidence, and instrumentalities of a robbery that affected interstate commerce and conspiracy to commit that offense, in violation of 18 U.S.C. § 1951(a), as described in Attachment B-3.

7.    The statements contained in this affidavit are based on my own investigation and on

documents, and information provided to me by officers of the Brockton Police Department ("BPD"), Massachusetts State Police ("MSP") and Plymouth County Sheriff Department ("PCSD").  This affidavit is submitted for the limited purpose of establishing probable cause for the above-referenced search warrant applications and therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of this investigation.

## **PROBABLE CAUSE**

8.      On Saturday, January 26, 2019, at approximately 7:11 p.m., the T-Mobile store located at 521 Belmont Street, Brockton, MA, was robbed by four individuals, three of whom entered the store with firearms. I have reviewed the video of the robbery. The video depicts the store manager, Gardy Dertelus, being robbed by three individuals who appear to be holding handguns.

9.      Almost immediately after entering the store, the individuals forced Dertelus to open the door to the back where inventory and cash are held.  Once inside, the three individuals proceeded to grab phones and other items from a cabinet and placed them into a black duffel bag and a plastic bag.  The three individuals then run out of the store.

10.     Dertelus reported the incident to Brockton Police. After the incident, Dertelus reported that two individuals entered the store, pointed firearms at him and demanded to know where the cash and phones were kept.  Dertelus then informed the two men that the phones and cash were kept in the back and attempted to enter the combination to the door.

11.     Dertelus stated that while entering the combination, the individual with the large silver firearm (believed to be DARIUS CARTER) struck him on the forehead with the firearm while Dertelus was attempting to open the door to the rear area.

I.      **REVIEW OF STORE VIDEO**

12.     In the video, two individuals can be observed entering the store, followed by a third individual who enters a few seconds afterward.  All three individuals are believed to be wearing gloves.

13.     The first individual is dressed in a black long-sleeve hooded sweatshirt with a white marking on the left breast, black pants with a white marking on the left thigh, white gloves with black accents, and black sneakers with a distinct strip of white along the soles.  This first individual has been identified to be DARIUS CARTER.

14.     Still images from the store surveillance video depicting DARIUS CARTER holding a silver large-frame firearm follow:



15.     The second individual is dressed in a black long sleeve top or jacket, a black ski mask, light blue jeans with distinct wash coloring patterns, gloves and distinct dark textured grey sneakers, with black around the laces area.  The second individual can be observed holding what appears to be a silver or light-colored small-frame firearm in his right hand, and a black duffel bag in his left.

This second individual has been identified to be STEPHAN ROSSER-STEWART.

16.     Still images from the store surveillance video depicting STEPHAN ROSSER-STEWART

holding a silver small-frame firearm follow:



17.     The third individual entered the store shortly after the first two individuals, while Dertelus

was in the process of opening the rear door.  The third individual was dressed in a dark colored

hoodie sweatshirt, dark pants, and white sneakers.  This third individual has been identified to be

DENNIS MARTIN.

18.     When they first entered the store, DARIUS CARTER pointed a large-frame silver firearm

at Dertelus and motioned him to the rear door.  ROSSER-STEWART also pointed a small-frame

light colored firearm at Dertelus.  Both DARIUS CARTER and ROSSER-STEWART walked to

the rear door and stood near Dertelus as he opened the door.  A few seconds later, MARTIN entered

the store with his hood covering his face and hands in his pockets.

19.     The three robbers and Dertelus entered the rear room and Dertelus opened a large cabinet

that contained phones and tablets.  DARIUS CARTER can be observed wearing what appear to

be white gloves with a black accent markings.

20.     MARTIN then can be seen holding a small black firearm and pointing it at Dertelus.  At points, the magazine of the firearm held by MARTIN can be seen extending well beyond his hand, consistent with an extended magazine.

21.     Still images from the store surveillance video depicting DENNIS MARTIN in the rear room holding a black small-frame firearm with an extended magazine follow:



22.     ROSSER-STEWART placed phones and tablets into the black duffel bag while MARTIN pointed the black firearm at Dertelus.  At points, MARTIN covers his face with his free hand.

23.     While in the rear room grabbing phones, ROSSER-STEWART bent over and the video captured that he was wearing a pink/purple article of clothing underneath his jeans.  Still images from the store surveillance video depicting STEPHAN ROSSER-STEWART bent over follow:



24.     DARIUS CARTER then exited the rear room and walked to the front of the store clutching his front pocket, consistent with concealing his firearm.  DARIUS CARTER then returned to the rear room and assisted with taking the items from the large cabinet.  DARIUS CARTER and ROSSER-STEWART then worked together to place phones and tablets in the duffel bag.

25.     MARTIN then located a plastic bag from the corner of the room and provided it to ROSSER-STEWART and DARIUS CARTER to hold additional items.  DARIUS CARTER and DENNIS MARTIN then left the rear room, with MARTIN carrying the plastic bag, and exited the store.  ROSSER-STEWART remained in the rear room for a few seconds, focused on the black duffel bag, and then exited the store carrying the black duffel bag.

26.     In total, the robbery lasted about 3 minutes and resulted in the theft of approximately $20,000 in cell phones and tablets, and approximately $4,500 in cash.  The T-Mobile store that was robbed is believed to be owned and operated by Express Stores, a New Jersey based corporate entity engaged in interstate commerce.  It is my understanding that Express Stores is a franchisee of T-Mobile, selling the product and services of T-Mobile at the physical storefront operated by Express Stores.  The cellular phones that were stolen were largely comprised of Apple iPhone brand phones that I believe had travelled in interstate commerce prior to their theft on January 26, 2019.  The store was also closed immediately after the robbery.

## II.     THE CHASE

27.     Dertelus called 911 and reported the robbery.  After the robbery was reported to the police, Brockton PD officers learned that a GPS tracking device had unknowingly been taken by the robbers, and the GPS tracking device was transmitting its current location to a remotely accessible service.  The location of the GPS tracking device was then relayed to responding officers.

28.     Of note, the T-Mobile store is at the intersection of Belmont Street and Torrey Street in

Brockton, which is approximately one mile from the Route 24 on-ramps providing quick access to the highway.   After the theft, the GPS tracking device location showed that it travelled away from the highway onramps and toward downtown Brockton.

29.     Brockton PD Officers responded to the locations being provided by the GPS tracking device and observed a motor vehicle, later identified to be a white Chevrolet Malibu, Illinois Registration Y874293, travelling at a high rate of speed (the "white Malibu").

30.     Officers attempted to stop the white Malibu using lights and sirens, but it continued to accelerate and did not stop at a red light.  Officers continued to pursue the white Malibu as it made a number of high-speed turns in a residential neighborhood, and officers observed that the occupants of the white Malibu were throwing items from the vehicle as they fled.  The data from the GPS tracking device indicated that the unit reached speeds of over 70 mph.

31.     As the chase continued onto Summer Street, Officer Sylverson Robinson in the lead cruiser, reported gunshots being fired at his cruiser from the white Malibu.  In particular, while on Summer Street, approximately 40 to 50 feet behind the white Malibu, Robinson observed the torso of an individual on the passenger side of the white Malibu extend out of the vehicle and then he observed muzzle flashes and heard gunfire.

32.     Brockton Shot Spotter reported a total of 9 gunshots being fired in the area of Summer Street, Brockton, MA, consistent with the path and time of the chase and the coordinates reported by the GPS tracking device.[1]   I do not believe that any of the police officers chasing the white Malibu returned fire.

33.      Officers continued to follow the white Malibu and the GPS tracker location.  Shortly after

---

[1] Later, a resident of 323 Summer Street, Brockton, MA, called police and provided them with a 9mm shell casing he had found in his driveway.

the gunfire, the white Malibu came to a stop at the intersection of Bristol Avenue and Carl Avenue. Bristol Avenue is a short dead end street.  Officers observed the occupants run west from the white Malibu up Bristol Avenue, and observed them cut through backyards of the residences onto Baker Street, which runs parallel to Carl Avenue, and then terminates.

34.     Near the white Malibu, in the rear of 20 Bristol Avenue, Officers recovered a gray Alcatel cell phone that was identified to be Model #A574BL, IMEI:  015295004113576 (the "Alcatel phone").  The Alcatel phone was found along the general path of flight taken by the suspects as they ran from the white Malibu down Bristol Avenue and across backyards away from police.  The Alcatel phone did not bear indications of prolonged exposure to the elements.

35.     Also on Bristol Avenue, officers recovered a pair of white Nike sneakers consistent with the sneakers observed to be worn by the third individual, DENNIS MARTIN, in the store video.

## III.    THE WHITE MALIBU

36.     Brockton PD Officers secured the white Malibu.  Some of the pertinent items observed in the white Malibu were:

| Location in White Malibu | Item Description |
|---|---|
| Front passenger seat area | Black duffel bag containing electronics (cell phones, Apple iPhones and tablets) and gray strong box stolen from T-Mobile store; .22 caliber shell casing; black jacket |
| Rear seat, center | Black Patriots hat |
| Rear seat, right side | White glove with black accent |
| Rear floor, center | Clear trash bag with red pull top containing more electronics |
| Rear floor, right side | White glove with black accent |
| Map pocket, on back of driver's seat | Currency totaling $1,045 |
| Glove box | Hertz Rental Agreement, indicating CARSHANA GRAHAM as renter, and DIOVANNI CARTER as authorized driver |

37.     The two white gloves with black accent found in the rear of the vehicle appeared to be consistent with the gloves worn by DARIUS CARTER in the store video.

9

38.     Also in the vehicle, investigators located a letter from Capital One addressed to DIOVANNI CARTER, and a Massachusetts Jury summons addressed to DIOVANNI CARTER.

39.     The Apple iPhones recovered from the white Malibu bore packaging that stated: "Designed by Apple in California Assembled in China."  Two Samsung products recovered from the white Malibu bore packaging that stated "Made in Vietnam."  As such, I believe that prior to being stocked by the T-Mobile store in Brockton, MA, and stolen by the robbers on January 26, 2019, the stolen phones and tablets travelled in interstate and foreign commerce.

40.     Two black jackets were also observed in the white Malibu – one was found in the front passenger seat, the other was found in the rear seat in the center.  The black jacket in the front passenger seat appeared consistent with the black top worn by ROSSER-STEWART in the store video.  Upon reviewing the physical evidence that was collected by Brockton Police, it is my understanding that these two jackets were not seized as evidence.

41.     Deputy Dana Fowler of the Plymouth County Sheriff's Department, examined the white Malibu for latent fingerprints. Deputy Fowler recovered a latent print on the right rear door frame that matched to DIOVANNI CARTER.  This match was verified by Deputy Paul Souza.

42.     Officers determined that the white Malibu was a Hertz rental car. The rental agreement recovered from the white Malibu listed DIOVANNI CARTER as an authorized driver.

43.     Records obtained from Hertz for the rental of the white Malibu stated that CARSHANA GRAHAM of 26 Wilmore Street, Mattapan, MA, was the listed renter.  The records disclosed a phone number of 617-704-2207 for the rental.  The records further disclosed that a credit card ending in 0294, believed to be associated with Capital One, was used to pay for the rental.

44.     Officers also located two unopened pieces of mail addressed to DIOVANNI CARTER in the white Malibu: a Massachusetts jury summons and correspondence from Capital One.

IV.     **EXPRESS EMPLOYMENT PROFESSIONALS**

45.     Records obtained from Express Employment Professionals, DIOVANNI CARTER's employer, revealed that DIOVANNI CARTER was a contract employee of the company.  Express Employment Professionals used an email address of DIORMAURICECARTER@GMAIL.COM to communicate with DIOVANNI CARTER on January 25, 2019, for an assignment on January 28, 2019.

46.     Another entry in the Express Employment records on January 25, 2019, states that Express Employment received an e-mail from DIOVANNI CARTER. The comment for that entry stated "Yes I've received your email and I will be there Monday."

47.     Records from Express Employment showed that on January 21, 2019, DIOVANNI CARTER updated his cellular phone number with the company, and provided the number of 617-704-2207 as his cellular phone number.  This is the same number contained in the records received from Hertz for the rental of the white Malibu.

48.     Records from Express Employment Professionals showed DIOVANNI CARTER was in contact with Express Employment on January 25, 2019, and January 28, 2019 (two days after the robbery).  The log kept by Express Employment about this conversation on January 28, 2019, states in the comment section: "Ending assignment today, has a lot going on in his life right now and cant work. Will call when he is ready to work again."

49.     From corporate letterhead, I know the phone number for Express Employment Professionals to be 781-848-2324.  Review of the call detail records for 617-704-2207 reveals calls with 781-848-2324 on January 21, 2019, January 25, 2019, and January 28, 2019, consistent with the dates of contact with DIOVANNI CARTER recorded on the records of Express Employment Professionals.

11

## V.      ARREST OF DARIUS CARTER

50.      While searching the area south of 47 Baker Street, Brockton Police Sergeant David Farrell heard noises consistent with a human presence.  Sgt. Farrell entered a nearby wooded area and observed DARIUS CARTER lying on the ground.  DARIUS CARTER was wearing black sweatpants with a white logo on the left thigh, a black Nike sweatshirt with a white logo on the left breast, and black shoes that had a distinct white strip along the bottom portion of the sole.  This clothing was identical to that worn by the first individual in the store video.  CARTER was placed under arrest.

51.      Photographs of the sweatshirt, pants and black sneakers with white along the soles, worn by DARIUS CARTER at the time of his arrest follow:





## VI.    FIREARM RECOVERY

52.    Deputy Scott Sawler, and his K-9 Colby, of the PCSD also responded to the area of the CARTER arrest.  Approximately 15 yards from the location of the arrest, Colby directed officers to an area between two rocks.  Officers searched that location and recovered two firearms that were later identified to be: (1) a black Ruger LCP, .380 caliber, semi-automatic bearing s/n 37605289 (the "black Ruger") complete with a distinctive magazine that extended beyond the pistol grip; and (2) a silver Armi Fratelli Model TA90, 9mm, semi-automatic bearing s/n G11503 ("silver Armi Fratelli").

53.    The serial numbers for the black Ruger and silver Armi Fratelli were queried and it was determined that both firearms had been previously reported stolen.  The black Ruger had been previously reported stolen from Louisburg, North Carolina.  The silver Armi Fratelli had been previously reported stolen from Chatanooga, Tennessee.

54.    As noted, the black Ruger contained an extended magazine.  Twelve rounds of .380 caliber

ammunition were in the magazine, and one round was in the chamber. I have reviewed photographs of the recovered black Ruger and I believe it to be the firearm held by DENNIS MARTIN in the store video.

55. The silver Armi Fratelli was recovered with a magazine. There was no ammunition recovered from the magazine or in the chamber of the Armi Fratelli 9mm firearm. I have reviewed photographs of the recovered silver Armi Fratelli and I believe it to be the firearm held by DARIUS CARTER in the store video.

56. ATF Special Agent Patrick Briody, a trained expert in the examination and analysis of firearms and ammunition, inspected the black Ruger and the 13 rounds of ammunition, and the silver Armi Fratelli. SA Briody determined that the black Ruger and silver Armi Fratelli were both firearms for purposes of federal law, and that both the silver Armi Fratelli and the black Ruger were manufactured outside of Massachusetts, meaning that they had travelled across state lines or an international boundary prior to their seizure by police on January 26, 2019.

57. SA Briody also inspected the 13 rounds of .380 caliber ammunition from the black Ruger and determined that the 13 rounds were "ammunition" for purposes of federal law. SA Briody also opined that, based upon head stamps, the 13 rounds of ammunition had been manufactured outside of Massachusetts meaning that all 13 rounds of ammunition had travelled across state lines or an international boundary prior to their seizure by police on January 26, 2019.

58. A photograph of the black Ruger and extended magazine follows:

14



59.     A photograph of the silver Armi Fratelli and magazine follows:



## VII.    ARREST OF DENNIS MARTIN

60.     While officers searched the area, Det. Lopez and Det. Almeida of Brockton PD walked by 44 Baker Street, and they heard a noise that came from behind a picket fence.  Det. Almeida looked over the fence and observed DENNIS MARTIN, who was placed under arrest.

61.     When placed under arrest, MARTIN was wearing a navy blue Polo brand hoodie, and navy blue sweatpants, consistent with the clothing worn by the third individual in the store video. MARTIN also was not wearing footwear, and later confirmed that the white Nike sneakers found near the abandoned white Malibu were his sneakers.  The clothing worn by MARTIN and the white Nike sneakers were identical to the clothing worn by the third individual depicted in the store video during the robbery.

15

62.     Photographs of the navy sweatshirt, and navy pants worn by DENNIS MARTIN at the time of his arrest follow:



## VIII.   ARREST OF STEPHAN ROSSER-STEWART

63.     MSP Trooper Eric Resendes responded to the chase and searched the area in coordination with Brockton PD officers.   Trooper Resendes observed an individual later identified to be STEPHAN ROSSER-STEWART cross Carl Avenue, Brockton, MA, in front of his cruiser and walk up the front steps of 149 Carl Avenue.   This location was about 1500 feet from where the white Malibu was abandoned.   Resendes observed STEPHAN ROSSER-STEWART wearing light jeans.

64.     After DENNIS MARTIN was initially apprehended, MARTIN was provided Miranda rights and waived those rights. MARTIN identified a photograph of STEPHAN ROSSER-STEWART as one of his accomplices in the robbery.   After being detained by Resendes, ROSSER-STEWART was placed under arrest.

65.     The jeans and shoes worn by ROSSER-STEWART at the time of his arrest appeared

16

identical to those worn by the second individual in the store video.  Additionally, investigators

believe that ROSSER-STEWART was wearing a black jacket during the robbery that was

consistent with a black jacket observed in the white Malibu.

66.     Photographs of the light jeans, and grey sneakers worn by STEPHAN ROSSER-

STEWART at the time of his arrest follow:[2]



## IX.    POST-MIRANDA STATEMENT BY DENNIS MARTIN

67.     At the station, DENNIS MARTIN was again provided a Miranda warning and waived

those rights. MARTIN provided a full recorded statement.

68.     MARTIN stated that he had come to Brockton with three other individuals, later identified

to be DIOVANNI CARTER, DARIUS CARTER and STEPHAN ROSSER-STEWART, as part

of a plan to rob a marijuana dealer.

---

[2] In the store video, the red tongues of the sneakers are not visible, though the black color
around the laces is discernible.   Additionally, in the video, ROSSER-STEWART's jeans appear
to have been pulled down, which may have concealed the distinctive red tongue of the sneakers.

69.     MARTIN stated that the individual later identified to be DIOVANNI CARTER provided MARTIN, ROSSER-STEWART and DARIUS CARTER with the firearms for this marijuana robbery.  When the plan to rob the dealer fell apart, DIOVANNI CARTER orchestrated the plan to rob the T-Mobile store.

70.     MARTIN stated that DARIUS CARTER and STEPHAN ROSSER-STEWART seemed to already know about the plan to rob the T-Mobile store.

71.     MARTIN stated that he was armed with a small-frame black semi-automatic .380 caliber handgun with a large magazine.  MARTIN stated that DARIUS CARTER was armed with a silver large frame semi-automatic pistol.  MARTIN stated that STEPHAN ROSSER-STEWART was armed with what he described as a black semi-automatic .40 caliber pistol.

72.     MARTIN stated that DIOVANNI CARTER drove them to the area of the T-Mobile store. MARTIN stated that DIOVANNI CARTER remained in the vehicle while MARTIN, ROSSER-STEWART and DARIUS CARTER committed the robbery.

73.     After the robbery, MARTIN stated that MARTIN, ROSSER-STEWART and DARIUS CARTER got back into the vehicle and DIOVANNI CARTER drove them away from the T-Mobile store.  MARTIN stated that DIOVANNI CARTER was driving at extremely high speeds during the getaway, and MARTIN wanted to get out of the vehicle.

74.     MARTIN stated that there were four occupants of the vehicle: DIOVANNI CARTER was driving, STEPHAN ROSSER-STEWART was in front passenger seat, MARTIN was in the rear on the left, behind the driver's seat; and DARIUS CARTER was in the rear on the right, behind the front passenger seat.

75.     As they fled from the police, MARTIN heard DARIUS CARTER state he was not going back to jail.  DARIUS CARTER then rolled down the window and started shooting at the pursuing

police cruisers.  MARTIN described hearing 4 to 5 gunshots.  MARTIN was not sure if ROSSER-STEWART fired at officers.  MARTIN stated that he ducked down, fearing return gunfire from the police.

76.      MARTIN stated that DIOVANNI CARTER then stopped the car and the four occupants ran away on foot.  MARTIN identified DIOVANNI CARTER as the operator of the vehicle in a blind photo array.

77.      DIOVANNI CARTER was not apprehended on January 26, 2019, and a state court warrant has been outstanding for him since the robbery.

## X.      RECOVERY OF .22 CALIBER FIREARM

78.      On February 5, 2019, Brockton Police responded to 108 Litchfield Street, Brockton.  The homeowner reported that her son, Matt, had found a handgun by the fence of their home and picked it up.  Once Matt realized it was a loaded, he reported it to his mother, who then called the police.  Brockton Police arrived and recovered the firearm, and determined it to be a .22 caliber Jennings brand firearm, bearing s/n 290106 (the "silver Jennings").  Officers recovered one live round of ammunition in the chamber, and no ammunition in the magazine.

79.      The address of 108 Litchfield is essentially behind 20 Bristol Avenue, and within the general path of flight of the suspects when they fled from the white Malibu.  Of note, the Alcatel phone was recovered in the yard of 20 Bristol Avenue, immediately behind 108 Litchfield, within a distance of 150 feet or so.

80.      I have reviewed a photograph of the recovered .22 caliber Jennings and I believe it to be the firearm held by STEPHAN ROSSER-STEWART in the store video.

81.      A photograph of the silver Jennings follows:



## XI.    ADDITIONAL INVESTIGATION AND FIFTH SUSPECT

82.      Investigators obtained the store video for the entire day of January 26, 2019. I have reviewed portions of this video.

83.      At approximately 2:21:25 PM, a heavy set black male entered the T-Mobile store at 521 Belmont Street, Brockton, MA.  This male is wearing a black hat, grey hooded sweatshirt with white logo on the left breast, grey sweatpants and white sneakers.  The individual has a beard and long hair visible from beneath a winter cap. This male enters the store and appears to be holding a cellular phone in his right hand.  Within 10 seconds of entering the store, and prior to engaging sales personnel, he looked down at what appears to be a cellular phone in his right hand and put it up to his ear.

84.      The individual then appeared to be holding his cellular phone to his ear while walking around the store.  During this time, the individual appeared to be looking around the store without focusing on any products or other merchandise.  After appearing to speak on his cell phone for approximately 30 seconds, he walked to the counter and engaged Dertelus and another sales associate.  The individual engaged in conversation at the counter for approximately two minutes and the left the store at 2:24:49 PM looking at his cellular phone.

85.      The individual was in the store for approximately 3 minutes.  I believe, based on this

activity and the subsequent robbery about 5 hours later, that this fifth individual cased the T-Mobile store and was looking around in order to identify information that would be relevant to the later robbery.  Such information would include the number of people working at the store, the number of customers, the employees' ability and willingness to resist an armed confrontation, the physical layout of the store and surrounding streets, the location of merchandise, points of exit and entry, and the presence of alarms and cameras.

86.     Still images of this fifth individual from the store surveillance cameras follow:



87.     On February 8, 2019, MSP Trooper John Sullivan entered 82 Carl Avenue, Brockton, MA, to execute state arrest warrants on unrelated matters. While inside 82 Carl Avenue, Trooper Sullivan had interaction with JAMES BODDIE, who was present in 82 Carl Avenue and appeared to be residing at the address.  Trooper Sullivan was familiar with JAMES BODDIE and knew him.

88.     On February 26, 2019, I discussed the efforts by MSP and the United States Marshalls to locate DIOVANNI CARTER with Trooper Sullivan and mentioned the possible involvement of JAMES BODDIE in the robbery.  Trooper Sullivan stated that he recently encountered BODDIE during the arrests made at 82 Carl Avenue.  I then showed Trooper Sullivan the photographs of the fifth individual in the T-Mobile store on 1/26/19 at 2:21 PM, set forth above; Trooper John Sullivan recognized the fifth individual in those photographs to be JAMES BODDIE.

## XII.    THE ALCATEL PHONE / TARGET PHONE 4

89.    The Alcatel Phone recovered from 20 Bristol Avenue was visually examined by Det. Patrick Donohue of Brockton Police.  Det. Donohue removed the rear casing of the Alcatel Phone and the battery.  Underneath the battery, the Alcatel Phone had identifying information printed that identified TracFone Wireless, Inc. as the carrier, the model number to be: A574BL, and the IMEI number to be: 015295004113576.

90.    TracFone, Wireless is in fact not a wireless carrier itself, but markets phones and pre-paid cellular phone plans that use wireless networks owned by larger carriers.  TracFone leases the use of wireless networks from the company that owns the network and sells prepaid plans, phones and other products that make use of the leased network facilities.  As such, the connectivity records and cell site location information for a pre-paid TracFone would in fact be stored, kept and maintained by the wireless carrier who owns the network on which the TracFone operates. TracFone maintains billing and usage information for its subscribers to the extent necessary to bill and account for usage, but does not maintain the network infrastructure necessary for cellular connectivity.

91.    Records were obtained from TracFone Wireless, Inc. for the accounts associated with IMEI #: 015295004113576 (the Alcatel Phone).  Those records revealed that the Alcatel Phone was a pre-paid TracFone associated with the phone number 617-602-9101 (Target Phone 4).  The TracFone records revealed the 617-602-9101 phone (Target Phone 4), was in fact serviced by the T-Mobile network.

## XIII.   PHONE RECORDS REVIEW

### A.     617-704-2207 - TARGET PHONE 1

92.    Investigators reviewed call detail records from Sprint Corporation for the 617-704-2207

phone on the day of January 26, 2019.  Review of those records showed communications between 617-704-2207 (identified as DIOVANNI CARTER's phone) and 508-408-3998 (identified to be JAMES BODDIE's phone), before and after the T-Mobile robbery.

93.     A table showing the calls between 617-704-2207  and 508-408-3998 on January 26, 2019 follows, with a notation of the time of the robbery:

| Time | Duration (Seconds) | Type | Direction | Originating # | Terminating # |
|---|---|---|---|---|---|
| 6:38:00 PM | 51 | Other | Outgoing | (617) 704-2207 | (508) 408-3998 |
| 6:43:02 PM | 76 | Other | Other | (508) 408-3998 | (617) 704-2207 |
| 6:46:01 PM | 30 | Other | Outgoing | (617) 704-2207 | (508) 408-3998 |
| 6:46:54 PM | 543 | Other | Outgoing | (617) 704-2207 | (508) 408-3998 |
| 7:11 PM | Assailants enter the T-Mobile Store | | | | |
| 7:37:59 PM | 51 | Voice | Other | (617) 704-2207 | (508) 408-3998 |
| 7:43:08 PM | 70 | Voice | Incoming | (508) 408-3998 | (617) 704-2207 |
| 7:46:01 PM | 29 | Voice | Other | (617) 704-2207 | (508) 408-3998 |
| 7:46:53 PM | 543 | Voice | Other | (617) 704-2207 | (508) 408-3998 |

**B.     857-212-7918 - TARGET PHONE 3**

94.     Investigators   reviewed   subscriber   information   and   call   detail   records   from   Sprint Corporation for the 857-212-7918 phone ("Target Phone 3").  The subscriber of Target Phone 3 is LORIE MAJOR, the mother of DARIUS CARTER and DIOVANNI CARTER.  LORIE MAJOR is also the subscriber of 617-704-2207, and the subscriber information lists 19 Elmhurst Street, Boston, MA, address.

95.     I have reviewed the call detail records for Target Phone 3 for the period of January 1, 2019, through February 6, 2019.  Review of those call detail records indicate that the last outgoing call made by Target Phone 3 was on January 26, 2019, at 6:04 PM.  Since that time, numerous incoming calls have been made to Target Phone 3, including from the 617-704-2207 phone, and the 508-408-3998 phone.  None of the incoming calls to Target Phone 3 made after the time of the robbery appear to have been answered by Target Phone 3 because the durations of the incoming calls are less than 30 seconds, which are not consistent with the call being answered.

96.     Additionally, according to the call detail records, Target Phone 3 has not made any outgoing calls since the time of the robbery.  As such, this call detail activity is consistent with Target Phone 3 being the phone number used by DARIUS CARTER, and therefore, not accessible or useable by DARIUS CARTER after he was arrested.

        C.      617-602-9101 - TARGET PHONE 4

97.     Investigators reviewed subscriber information and call detail records from TracFone Wireless for the 617-602-9101 phone ("Target Phone 4").  Because it is a pre-paid phone, there is no listed subscriber information for Target Phone 4.  The information provided by TracFone Wireless indicated that the phone is serviced by the T-Mobile network.

98.      I have reviewed the call detail records for Target Phone 4 for the period of January 22, 2019, through February 22, 2019.  Target Phone 4 has not conducted any network activity since January 26, 2019, at 19:20 (or 7:20 PM), consistent with the immediate moments after the robbery. The last network activity noted in TracFone Wireless records for Target Phone 4 was an outgoing connection (potentially a data connection) on January 26, 2019, at 7:20 PM.

99.     As such, I believe that Target Phone 4 is the mobile number associated with the Alcatel Phone recovered at 20 Bristol Avenue, and that the Alcatel Phone was in fact possessed by one of the robbers and discarded during their flight from police.  Therefore, evidence of the historical whereabouts of the Alcatel Phone will be found in the historical cell site information of Target Phone 4.

XIV.  PHONE ATTRIBUTION

100.    Subscriber records from Sprint Corporation dated 2/18/19 for 617-704-2207 (Target Phone 1) and 857-212-7918 (Target Phone 3) show that the subscriber is LORIE MAJOR, the mother of DIOVANNI CARTER and DARIUS CARTER.  Though not subscribed in his name, 617-704-

2207 (Target Phone 1) is believed to be used by DIOVANNI CARTER. Though not subscribed in his name, 857-212-7918 (Target Phone 3) is believed to be historically used by DARIUS CARTER.

101.    The user of 508-408-3998 (Target Phone 2) is believed to be JAMES BODDIE.  Subscriber records from Sprint Corporation dated 2/18/19, for the 508-408-3998 phone identify JAMES BODDIE as the subscriber, and list an address of 82 Carl Avenue, Brockton, MA.

102.    The user of Target Phone 4 is believed to be one of the individuals in the white Malibu, who discarded the Alcatel Phone during their flight from police.  The TracFone records for Target Phone 4 do not list a subscriber name.

## XV.    CAPITAL ONE RECORDS

103.    Investigators reviewed records from Capital One for accounts held by DIOVANNI CARTER.  Those records indicated that DIOVANNI CARTER applied for a Capital One credit card on February 1, 2019.  As part of the application, DIOVANNI CARTER provided his date of birth, social security number, address, a phone number of 617-704-2207, and an email address of DIORMAURICECARTER@GMAIL.COM, the Target Account.

## XVI.   GOOGLE RECORDS

104.    I have reviewed records from Google for the DIORMAURICECARTER@GMAIL.COM account for the period of January 1, 2019 through February 13, 2019.  Those records revealed that the account associated with the DIORMAURICECARTER@GMAIL.COM address is identified by Google Account ID: 20023072620, and was created on 11/16/18, and is currently "enabled" (the Target Account).  The services enabled for the Target Account include "Gmail, Location History, Minutemaid, Web & App Activity, YouTube."  The name associated with the Target Account is "DIOR CARTER".  The "SMS" number associated with the Target Account is

"16177042207," which is the phone number believed to be associated with DIOVANNI CARTER. The records did not contain any IP access logs, indicating the internet protocol address of the device used to access the account.

105.    I know from the records of Express Employment that Express Employment sent an email to the Target Account.  The comments and records indicate than a reply email was sent to Express Employment and that DIOVANNI CARTER had received the email.

106.    I reviewed header information produced by Google in this investigation for the Target Account. Header information includes date, time, sender, and recipient information for emails.

107.    In the header information for the Target Account, I observed the following:

    a.    an email sent from DIORMAURICECARTER@GMAIL.COM to JACKI.MUH@EXPRESSPROS.COM on January 25, 2019, at 12:28 p.m.;

    b.    an email sent by capitalone@notification.capitalone.com to DIORMAURICECARTER@GMAIL.COM, on February 1, 2019, at 11:23 p.m.; and

    c.    fourteen emails from PLAYSTATION@PLAYSTATIONEMAIL.COM to DIORMAURICECARTER@GMAIL.COM, from a date of January 3, 2019, through February 6, 2019.

108.    This activity of receiving and reading an email and sending a reply would have generated entries in the IP access logs of the Target Account.  The absence of such logs suggests that the IP access logs were deleted or that the user settings prevented these records from being stored by Google.

## XVII.  CLOTHING SEIZED FROM PLYMOUTH COUNTY CORRECTIONAL

109.    After executing search warrants to seize the clothing of DARIUS CARTER and STEPHAN ROSSER-STEWART from the Plymouth County Sheriff's Department (Crim. Nos. 19-mj-4103 and 19-mj-4107), I took photographs of the items.

110.    Among ROSSER-STEWART's items were a pair of pink/purple shorts.  These shorts

appeared consistent in color to the ones ROSSER-STEWART can be observed wearing in the store video when he bends over in the rear room.  A photograph of the shorts follows:



111.    Also among ROSSER-STEWART's items were the gray sneakers. I was able to observe that the sneakers in fact had zippers that ran along or underneath the laces.  It would appear that when zipped, the red coloring around the tongue is less visible.  A photograph of the sneakers follows:



**XVIII. JAMES BODDIE AND 82 CARL AVENUE**

112.    A review of the criminal history for BODDIE shows prior convictions for firearms and

narcotics offenses. Of note, BODDIE was prosecuted in Federal Court on Crim. No. 11-10382, for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). He was sentenced to 60 months of incarceration.

113. Massachusetts Registry of Motor Vehicle records associate BODDIE with an address of 82 Carl Avenue, Brockton, MA. I am familiar with the location of 82 Carl Avenue, Brockton, and know it to be about 600 feet from the location of Bristol Avenue and Carl Avenue, where the white Malibu was abandoned. Additionally, 82 Carl Avenue is approximately 800 feet from 149 Carl Avenue, the location where ROSSER-STEWART was apprehended.

114. I have queried the physical description of BODDIE and reviewed the Mass. RMV photo of BODDIE. The Mass. RMV photo for BODDIE depicts a black male having long hair and a significant beard, consistent with the individual depicted above in the grey sweatshirt and grey sweatpants who entered the T-Mobile store at 2:21 PM on January 26, 2019.

115. According to his Massachusetts Board of Probation Record, BODDIE is listed to be 6 feet 1 inches tall, and to weigh approximately 270 pounds. Review of recent booking photographs of BODDIE from October 2018, reveals that BODDIE matches that general physical description. From this, it appears that BODDIE matches the general physical description of the individual depicted above in the grey sweatshirt and grey sweatpants who entered the T-Mobile store at 2:21 PM on January 26, 2019.

116. As noted above, MSP Trooper John Sullivan encountered BODDIE on February 8, 2019, at 82 Carl Avenue, Brockton, MA, and identified BODDIE as the individual who entered the entered the T-Mobile store at 2:21 PM on January 26, 2019. From all of this information, I believe that BODDIE resides at 82 Carl Avenue, Brockton, MA and that his clothing and personal belongings, including his cellular phone are being kept at this address.

117.    82 Carl Avenue, is a single story dwelling, with a driveway to the right of the structure and the numbers 82 on the structure to the left of the front door facing the street.  A wood fence runs along the property line and there is a green tent to the right of the structure at the end of the driveway. 82 Carl Avenue is further described in Attachment A-3, and a recent photograph of 82 Carl Avenue is also included in Attachment A-3.

## XIX.   FELONY CONVICTIONS

118.    I have reviewed the criminal histories of DIOVANNI CARTER, DARIUS CARTER, STEPHAN ROSSER-STEWART, and DENNIS MARTIN.

119.    DIOVANNI CARTER was previously convicted of possessing a loaded firearm (MGL c. 269, § 10(a)), without a license, in Suffolk Superior Court on February 24, 2011 (Docket No. 1084CR11125).  After violating probation, DIOVANNI CARTER served two years in jail for this offense.  Carrying a firearm without a license carries a maximum penalty of five years in prison.

120.    DARIUS CARTER was previously convicted of assault and battery on a public employee in the performance of their duty (MGL c. 265, § 13D), in the Dorchester Division of the Boston Municipal Court on August 10, 2016 (Docket No. 1607CR001111).  Assault and battery upon a public employee carries a maximum penalty of two and one-half years in jail.  Under 18 U.S.C. § 921(a)(20), this conviction is not excluded from the definition of "crime punishable by imprisonment for a term exceeding one year."

121.    STEPHAN ROSSER-STEWART was previously convicted of armed robbery (MGL c. 265, 17) in Suffolk Superior Court on October 16, 2018 (Docket No. 1784CR00545). Armed robbery carries a maximum penalty of life in prison.

122.    DENNIS MARTIN was previously convicted of masked armed robbery (MGL c. 265, § 17), and larceny of property valued over $250 (MGL c. 266, § 30), in Middlesex Superior Court

on September 1, 2015 (Docket No. 1481CR00724).  MARTIN was placed on probation for this

offense and was on probation as of January 26, 2019.  Masked armed robbery carries a maximum

penalty of life in prison.  Larceny of property valued over $250 carried a maximum penalty of 5

years in state prison.

## XX.   CELL SITE LOCATION INFORMATION

123.    In my training and experience, I have learned that cellular phones and other cellular devices

communicate wirelessly across a network of cellular infrastructure, including towers that route and

connect individual communications.  When sending or receiving a communication, including data,

a cellular device broadcasts certain signals to the cellular tower that is routing its communication.

These signals include a cellular device's unique identifiers.

124.    I know that mobile phone providers have technical capabilities that allow them to collect

and generate at least two kinds of information about the locations of the mobile phones to which

they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data,

and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911

Phase II data provides relatively precise location information about the mobile phone itself, either

via GPS tracking technology built into the phone or by triangulating on the device's signal using

data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e.,

antenna towers covering specific geographic areas) that received a radio signal from the mobile

telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone

connected.  These towers are often a half-mile or more apart, even in urban areas, and can be ten

or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not

necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically

less precise that E-911 Phase II data.

125.    Based on my training and experience, I know that T-Mobile can collect cell-site data about cellular phones that use their network, such as Target Phone 4.  I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

126.    Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the user of Target Phone 4 and may assist in the identification of co-conspirators.

127.    Among other things, historical cell site information may assist law enforcement in determining whether the user of Target Phone 4 was in proximity to the location of the robbery on the date and time of the offense and potentially reveal prior instances in which the user was in the Brockton area, or in the vicinity of the T-Mobile store, or locations with the path of the white Malibu.  Additionally, historical cell site information can provide information as to an individual's pattern of life and locations where they frequent.  Coupled with other investigative methods, a geographical area that an individual frequents can be cross-referenced with other sources.  Once

cross-referenced, additional addresses, persons and places of interest, and investigative avenues can be pursued.  Such techniques can lead to valuable evidence of whom the actual user of a particular phone is or was during a certain period.

128.    The date range for the requested historical cell site location warrant for Target Phone 4 is from January 1, 2019 through February 1, 2019.  The date of January 1, 2019, is used as the starting point because data from January 2019 may assist in the investigation of the conspiracy to rob the T-Mobile store, and would also reasonably capture any efforts to prepare, plan, coordinate, or assist in the robbery.  The end date of February 1, 2019, is used to ensure that the number was not immediately ported to a new carrier.

129.    Based upon the fact that this investigation is continuing, I am requesting that this Court order T-Mobile to not disclose the existence of the search warrants seeking historical cell site location information, in accordance with 18 U.S.C. § 2705(b).  There is reason to believe that an adverse result as defined by 18 U.S.C. § 2705(a) could occur if the existence of the search warrants is disclosed by T-Mobile, specifically the endangerment of the life and physical safety of an individual, flight from prosecution, destruction of or tampering with evidence, intimidation of potential witnesses, and that the investigation would be seriously jeopardized.  I am asking this Court to order T-Mobile to not notify anyone of the existence of the search warrants for a period of one year from the date of issuance, or 30 days from the conclusion of the investigation, whichever is earlier.

130.    Because the warrant will be served on T-Mobile, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## XXI.   INFORMATION REGARDING GOOGLE AND GMAIL

131.    As is typical with Google accounts, the Target Account described in this affidavit has

various services and tools associated with it.  In my training and experience, and that of fellow

agents, I have learned that Google provides dozens of these services to Gmail users for personal

and/or business convenience.  These services include:  Calendar, Photos and Photo albums,

Contacts, Drive, Docs, Wallet, Maps, Waze, Voice, Picasa, YouTube, and many other

applications.  These services are often times directly accessible through a customer's Gmail

account.  For example:

    a.   Google Drive is a free file storage and synchronization service created by Google.  It allows users to store 15 gigabytes (GB) of files in the "cloud," (i.e., off-site servers) share files, and edit documents, spreadsheets, and presentations.  The service is integrated with Gmail.  Users who wish to send a file in Gmail like a photograph or a word processing document, can insert the file into the email message using Google Drive.  Google Drive is Gmail's default email attachment option.

    b.   Google Calendar is a time-management web application created by Google.  Users are required to have a Google account in order to use this application.  It is similar to desktop calendar applications such as Microsoft Outlook.  Calendar is integrated with other Google services, such as Gmail.  For example, if a message includes a reference to an event date or time, Gmail will automatically provide an option for the user to add the event to Google Calendar.

    c.   Google Contacts is a contact management tool that is available in Gmail.  Among other things, it allows Gmail users to send emails to individuals whose contact information has been saved.  These contacts can be located by name, categories, and other identifiable information.  Many of the contacts automatically populate based on Gmail communications.

    d.   Google Maps and Waze are navigational tools that provide mapping and navigation services to users.  These applications also use the GPS functionality of the user's devices to determine the navigation directions.

    e.   Google Photos and Picasa are photograph and video sharing and storage services offered by Google.  It allows unlimited photo and video storage, with back up ability to cloud services.  Larger photo files are saved to Google Drive, which, as previously mentioned, is linked to Gmail.

    f.   Google Hangouts is an instant messaging and text messaging service offered by Google.

g.  Google Voice is a voice over IP application offered by Google that permits a user to make phone calls over their internet connection.

132.  Aside from content information, Google also records and maintains records of certain types of metadata, such as IP addresses utilized by a user to access Google and geo-location information derived from GPS/cellular signal/Wi-Fi signal/Bluetooth connections of the device through which the user accessed Google.  Geo-location information for the device associated with an account is stored and maintained by Google through Location History.  Furthermore, Google keeps records that can reveal Google accounts associated to one another by virtue of the electronic device through which the accounts were accessed, such as the same computer or mobile phone. This includes accounts that are linked by "cookies," which are small pieces of text sent to the user's internet browser when visiting websites. These records, although not personally generated by the user in the way content is created, are a byproduct of how the services are facilitated and offered by Google.

133.  Google also the owns the Android Operating System software found on upwards of 80% of cellular phones throughout the world. Because of this, Google maintains a plethora of records associated with the various services and software they provide. When registering for many of the various types of Google accounts, Google asks subscribers to provide basic personal information, such as the subscriber's full name, physical address, telephone numbers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Additionally, during the user registration process Google may also record certain identification numbers for the device through which the user accessed Google, such as serial numbers, International Mobile Equipment Identity ("IMEI") numbers, Mobile Equipment Identifier ("MEID") numbers, Electronic Serial Number ("ESN"), etc.

134.  I know through my training and experience, as well as through discussions with other

34

agents, that individuals regularly use these integrated services in connection with their Gmail accounts by, for example, saving email attachments to or sending attachments via Google Drive. Likewise, Google Contacts is populated in part by individuals/entities that the user communicates with via Gmail.  Because each of the products are integrated and use a single log-in (the Google/Gmail log-in and password) and frequently auto-populate, Gmail users often use these related services together with their Gmail.

135.    I also know that a Google customer can keep unread, sent, and draft emails in their account indefinitely, as long as they are not deleted by the user.  In addition, Google has storage capacity that allows customers to store opened incoming mail and sent mail indefinitely if they choose, subject to a maximum size limit.

136.    Email providers also typically maintain electronic records relating to their customers. These records include account application information, account access information, and email transaction information.  Google stores and can provide this type of information.

137.    Some email providers, including Google, also store and can provide additional information associated with and accessed through a subscriber's account including the following:  address books, buddy lists, photos, files, data, Calendar, Contacts, Docs and Drive.  Of principal importance to this investigation, and the subject of this warrant request, are the full contents of the email account, including the integrated services Google Drive and Google Contacts.

138.    Email providers also typically maintain electronic records relating to their customers. These records include account application information, account access information, and email transaction information.

139.    The government may obtain both electronic communications and subscriber information from an email provider by obtaining a search warrant.  18 U.S.C. §§ 2703(a), 2703(c)(1)(A).  Any

court with jurisdiction over the offense under investigation may issue a search warrant under 18 U.S.C. § 2703(a), regardless of the location of the website hosting company or email provider whose information will be searched. 18 U.S.C. § 2703(b)(1)(A). Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant. 18 U.S.C. § 2703(g).

140.    This application seeks a warrant to search all responsive records and information under the control of Google, a provider subject to the jurisdiction of this court, regardless of where Google has chosen to store such information. Pursuant to 18 U.S.C. § 2713, the government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

141.    I request that this application, the warrant, the order, and any related papers be sealed by the Court until such time as the Court pursuant to Local Rule 7.2 directs otherwise.

142.    I further request that, pursuant to the preclusion-of-notice provisions of 18 U.S.C. § 2705(b), the Court order Google not to notify any person (including the subscriber to whom the materials relate) of the existence of this application or the Court's Order for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b).

143.    Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the federal investigation.   There is

accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by: giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior or intimidate potential witnesses. *See* 18 U.S.C. § 2705(b). Moreover, some of the evidence in this investigation is stored electronically. If alerted to the existence of the Order, the targets could destroy that evidence, including information saved to their personal computers, on other electronic media, or in social media accounts.

## FOURTEEN-DAY RULE FOR EXECUTION OF WARRANT

144.    Federal Rule of Criminal Procedure 41(e)(2)(A),(B) directs the United States to execute a search warrant for electronic evidence within 14 days of the warrant's issuance. If the Court issues this warrant, the United States will execute it not by entering the premises of Google, as with a conventional warrant, but rather by serving a copy of the warrant on the company and awaiting its production of the requested data. This practice is approved in 18 U.S.C. § 2703(g), and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.

145.    Based on my training and experience and that of other law enforcement, I understand that email providers sometimes produce data in response to a search warrant outside the 14-day period set forth in Rule 41 for execution of a warrant. I also understand that email providers sometimes produce data that was created or received after this 14-day deadline ("late-created data").

146.    The United States does not ask for this extra data or participate in its production. Should Google produce late-created data in response to this warrant, I request permission to view all late-created data that was created by Google, including subscriber, IP address, logging, and other transactional data, without further order of the Court. This information could also be obtained by

37

grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit.  However, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as email, absent a follow-up warrant.  For these reasons, I request that the Court approve the procedures in Attachment B-2, which set forth these limitations.

147.     Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## CONCLUSION

148.     Based on the information described above, there is probable cause to believe that DIOVANNI CARTER, DARIUS CARTER, STEPHAN ROSSER-STEWART and DENNIS MARTIN have violated 18 U.S.C. § 1951(a), through the commission of a robbery that affected interstate commerce and conspiracy to commit a robbery to commit that offense.  Additionally, based on the information described above, there is probable cause to believe that DARIUS CARTER, STEPHAN ROSSER-STEWART and DENNIS MARTIN have violated 18 U.S.C. § 922(g)(1), by possessing firearms and ammunition after having been convicted of crimes punishable by more than one year in prison.

149.     Based on the information described above, there is probable cause to believe that the historical cell site information for Target Phone 4 will contain evidence of the crimes described above, including robbery affecting interstate commerce and conspiracy to commit that offense, in violation of 18 U.S.C. § 1951(a), and possession of firearms by persons convicted of crimes punishable by more than one year in prison, in violation of 18 U.S.C. § 922(g)(1).

150.     Based on the information described above, there is probable cause to believe that

DIOVANNI CARTER is the user and owner of the Target Account. Based on the information described above, there is probable cause to believe that the records and data for the Target Account will contain evidence of the crimes described above, including robbery affecting interstate commerce and conspiracy to commit that offense, in violation of 18 U.S.C. § 1951(a), and possession of firearms by persons convicted of crimes punishable by more than one year in prison, in violation of 18 U.S.C. § 922(g)(1).  Additionally, the records and data for the Target Account will assist investigators in locating DIOVANNI CARTER, who is a suspect in the robbery, and a fugitive on a state warrant.

151.    There is probable cause to believe the grey sweatshirt with a white logo on the left breast, grey sweatpants, white sneakers and black hat worn by JAMES BODDIE on January 26, 2019, are evidence, and instrumentalities of the crimes described above, including robbery affecting interstate commerce and conspiracy to commit that offense, in violation of 18 U.S.C. § 1951(a). There is probable cause to believe any cellular phone currently or historically associated with the 508-408-3998 phone number or with JAMES BODDIE is evidence, and an instrumentality of the crimes described above, and contains evidence of the crimes described above, including robbery affecting interstate commerce and conspiracy to commit that offense, in violation of 18 U.S.C. § 1951(a).

152.    Based on the information described above, there is probable cause to believe that evidence,

and instrumentalities of the robbery affecting interstate commerce and conspiracy to commit that

offense, in violation of 18 U.S.C. § 1951(a), will be found in 82 Carl Avenue, Brockton, MA.

Signed under the pains and penalties of perjury this 27th day of February 2019.

Special Agent David F. Simmons
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me this 27th day of February 2019.

HON. DAVID H. HENNESSY
CHIEF UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-1**

Records and information associated with the 617-602-9101 phone number ("Target Phone 4"), whose service provider is T-Mobile, US, Inc., a company that accepts process at T-Mobile US, Inc., located at 4 Sylvan Way, Parsippany, New Jersey 07054, and stored at premises controlled by T-Mobile, US, Inc. ("T-Mobile"), headquartered at T-Mobile US, Inc., located at 4 Sylvan Way, Parsippany, New Jersey 07054.

As applicable to each warrant, the phone number listed above is individually referred to as the "Account" in Attachment B-1, and T-Mobile is referred to as the "Provider" in Attachment B-1.

**ATTACHMENT B-1**

I.   Historical records related to Target Phone 4 described in Attachment A-1

The Provider is also required to disclose to the government the following information pertaining to the Account associated with the Target Phone 4 listed in Attachment A-1 for the period of January 1, 2019 through February 1, 2019:

a.   The following information about the subscribers of the Account:

  i.   Names (including subscriber names, user names, and screen names);

  ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

  iii.   Local and long distance telephone connection records;

  iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

  v.   Length of service (including start date) and types of service utilized;

  vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

  vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

  viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.   All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

  i.   Records of user activity for each connection made to or from the Accounts, including log files; messaging logs; the date, time, length, and method of

2

connections; data transfer volume; user names; and source and destination Internet Protocol addresses;

ii.    Information about each communication sent or received by the Accounts, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers);

iii.    All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Accounts, to include all voice, SMS, MMS, and data activity; and

iv.    All records containing round-trip-distance measurements for each connection made to or from the Accounts, to include NELOS, RTT, True Call Measurement Data, PCMD records, and all other records containing timing advance measurements and distance-to-tower measurements for all technologies (CDMA, GSM, UMTS, LTE, etc.) and Reveal Reports.

T-Mobile shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of one year from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the Court extends such period under 18 U.S.C. § 2705(b).  *See* 18 U.S.C. § 2705(b). T-Mobile may disclose this Order to an attorney for Sprint for the purpose of receiving legal advice.

## Information to be Seized by the Government

All information that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. § 1951(a), Hobbs Act Robbery, and conspiracy to commit Hobbs Act Robbery, and 18 U.S.C. § 922(g)(1), felon in possession of a firearm.  Including, the following:

A.    The locations of meetings and other aspects of the conspiracy, including where the conspiracy was formed and was furthered, weapons and ammunition were obtained, the crime committed, and where suspects intended to flee;

B.    The identity, location, and travel or historical whereabouts of any conspirators or associates, as well as any acts taken in furtherance of the crimes listed above;

3

**ATTACHMENT A-2**

The premises to be searched and seized are: Google account identified as:

DIORMAURICECARTER@GMAIL.COM, Google Account ID: 20023072620, and other data

stored with DIORMAURICECARTER@GMAIL.COM, Google Account ID: 20023072620,

including data from Google Location Services, Google Drive and Google Contacts, and other

information and date including subscriber, transactional, user connection information associated

with the account, as described further in Attachment B-2 (the "Target Account") .

This information for the Target Account is maintained by Google LLC ("Google"),

which accepts service of process at:

> Attn:  Google Legal Investigations Support
> Google
> 1600 Amphitheatre Parkway
> Mountain View, CA  94043
> Email:  USLawEnforcement@google.com
> https://support.google.com/legal-investigations/contact/LERS (website)

## ATTACHMENT B-2

I.    **Search Procedure**

   A.    Within fourteen days of the search warrant's issue, the warrant will be served on Google, which will identify the accounts and files to be searched, as described in Section II below.

   B.    Google will then create an exact electronic duplicate of these accounts and files ("the account duplicate").

   C.    Google will provide the account duplicate to law enforcement personnel.

   D.    Law enforcement personnel will then search the account duplicate for the records and data to be seized, which are described in Section III below.

   E.    Law enforcement personnel may review the account duplicate, even if it is produced more than 14 days after the warrant issues, subject to the following limitations. If data was created by Google after fourteen days from the warrant's issue ("late-created data"), law enforcement personnel may view any late-created data, including subscriber, IP address, logging, and other transactional data that was created by Google without a further order of the Court. Law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), absent a follow-up warrant.

II.   **Accounts and Files to Be Copied by Google Personnel**

A.    All data files associated with the Target Account as defined in Attachment A-2 within the possession, custody, or control of Google, "regardless of whether such information is stored, held or maintained inside or outside of the United States," *see* 18 U.S.C. § 2713, including:

   1.    The contents of all email, whether draft, deleted, sent, or received;
   2.    The contents of all text or instant messages;
   3.    The contents of all electronic data files, whether word-processing, spreadsheet, image, video, or any other content, including data files stored as email attachments, and files stored in Google Drive;
   4.    The contents of all calendar data;
   5.    Lists of friends, buddies, contacts, or other subscribers, including Google Contacts;
   6.    Location history for all identified/associated Account(s), to include deleted information, derived from Global Positioning System (GPS) data, cell site/cell tower triangulation precision measurement information such as timing advance or per call measurement data, Wi-Fi location information, and Bluetooth location information. Such data shall include the GPS coordinates, the dates and times of all location recordings, origin of how the location recordings were obtained, and estimated radius;
   7.    All photos and videos stored in the Account(s);
   8.    Passwords or other protective devices in place and associated with the Account(s), which would permit access to the content stored therein;
   9.    Web search history, including, but not limited to, mobile and desktop browser

searches;

10. Downloaded, installed, and/or purchased apps along with activity/registration information;

11. Voice and/or audio activity recordings/captures;

12. Google Map locations which are saved and/or frequent locations, favorite and/or starred locations including, but not limited to, searches conducted using the Google Maps and/or Waze services;

13. Google Voice incoming or outgoing phone calls, voicemails, including voicemail content and any and all incoming or outgoing text message history, together with the content thereof to include SMS, MMS, or any other form of text message communication, and any call forwarding numbers and account backup telephone numbers;

14. Communication including, but not limited to, audio, video, text message and/or chat delivered through the Google, Inc. service known as Google Hangouts;

15. Posts, status updates, photographs and/or videos that are contained and/or were uploaded in the services known as Google Photos, Picasa web albums, Google +, or any other service designed to store video, photographs, and/or data, including the metadata for each file;

16. Electronic files, folders, media, and/or data uploaded and/or contained on the service known as Google Drive;

17. Contacts stored using the service known as Google Contacts, including any contacts stored in the service known as Gmail, and any other service where contact lists are maintained;

18. Additional accounts linked by cookies.

19. Records pertaining to communications between Google and any person regarding these accounts and any email accounts associated with those addresses, including contacts with support services and records of actions taken.

B. All subscriber and transactional records for the Target Account and any associated email accounts, including:

1. Subscriber information for these and any associated email accounts:

   a. Name(s) and account identifiers;

   b. Address(es);

   c. Records of session times and durations;

   d. Length of service (including start date) and types of service utilized;

   e. Telephone instrument number of other subscriber number or identity, including any temporary assigned network address;

   f. The means and source of payment for such service (including any credit card or bank account number); and

   g. The Internet Protocol ("IP") address used by the subscriber to register the account or otherwise initiate service.

2.  User connection logs for any connections to or from these and any associated email accounts, including:

    a.  Connection time and date;

    b.  Disconnect time and date;

    c.  The IP address that was used when the user connected to the service;

    d.  Source and destination of any email messages sent from or received by the account, and the date, time, and length of the message; and

    e.  Any address to which email was or is to be forwarded from the account or email address.

## III.  Records and Data to be Searched and Seized by Law Enforcement Personnel

A.  All records and data, in whatever form, that constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1951(a) (Hobbs Act robbery and conspiracy to commit Hobbs Act robbery), 922(g)(1) (felon in possession of a firearm), and specifically including those related to:

1.  The identity of the person or persons who have owned or operated the Target Account or any associated email accounts;

2.  The existence and identity of any co-conspirators;

3.  The travel or whereabouts of the person or persons who have owned or operated the Target Accounts or any associated email accounts;

4.  The whereabouts of DIOVANNI CARTER;

5.  Communications, discussion, planning for and preparation of the robbery, including selection of targets, familiarity with roads and means of access, procurement of transportation, procurement of weapons and ammunition, the disposition and monetization of stolen items;

6.  The identities, aliases, addresses, email addresses, whereabouts, and telephone numbers, of conspirators and other persons furthering the conspiracy;

7.  Possession of firearms and ammunition;

8.  The locations of meetings and other aspects of the conspiracy, including where the conspiracy was formed and was furthered, weapons and ammunition were obtained, the crime committed, and where suspects intended to flee;

4

9. The methods of communications between conspirators and associates, including the telephone numbers, messaging applications, and social media accounts used by conspirators;

10. The substance of communications regarding criminal activities, including discussions regarding firearms, ammunition, robberies, and any acts of violence;

11. The identity, location, and travel or historical whereabouts of any conspirators or associates, as well as any acts taken in furtherance of the crimes listed above;

B.   All of the subscriber, transactional, and logging records described in Section II(B).

## DEFINITIONS

For the purpose of this warrant:

A.   "Data" means all information stored in any storage format and for any purpose.

B.   "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

**ATTACHMENT A-3**

82 Carl Avenue, Brockton, MA, and any associated curtilage.

82 Carl Avenue, is a single story dwelling, with a driveway to the right of the structure and the numbers 82 on the structure to the left of the front door facing the street. A wood fence runs along the property line and there is a green tent to the right of the structure at the end of the driveway. A photograph of 82 Carl Avenue, Brockton, MA follows:



**ATTACHMENT B-3**
*DESCRIPTION OF EVIDENCE TO BE SEARCHED FOR AND SEIZED*

All evidence, in whatever form, and tangible objects that constitute evidence, or instrumentalities of  Hobbs Act robbery, and conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), including:

1.      Black winter hat

2.      Grey hooded sweatshirt with white logo on the left breast

3.      Grey sweatpants

4.      White sneakers

5.      Any cellular phone associated with JAMES BODDIE

6.      Any cellular phone currently or historically associated with the 508-408-3998 phone number

7.      Records and documents pertaining to T-Mobile

8.      Records and documents which reflect evidence of the conspiracy including: notes, cryptic or otherwise, communications, planning, preparation, flight and evasion from police, procurement of firearms and ammunition, the whereabouts of any conspirators, the identity of any co-conspirators, log books, ledgers, documents and photographs which reflect relationships between identified and/or unidentified co-conspirators to include personal telephone/address books, including electronic organizers and rolodexes, and financial instruments such as pre-pay and/or bank debit cards, credit cards, checkbooks, and any other financial instrument used to purchase goods and services

9.      Records and documents that establish the person or persons who have access, control, possession, custody or dominion over 82 Carl Avenue, Brockton, MA

10.     Records and documents that establish the person or persons who have access, control, possession, custody or dominion over the black winter hat, grey hooded sweatshirt with white logo on the left breast, grey sweatpants, white sneakers, and cellular phones located in the premises of 82 Carl Avenue, Brockton, MA

**DEFINITIONS**

For the purpose of this warrant: the term "Records" means audio recordings, video recordings, memoranda, correspondence, diaries, maps, notes, address books, day planners, calendars, appointment books, newspaper clippings, articles, books, storage agreements and bills, storage locker keys, asset ownership records, journals, ledgers, financials, budgets, proposals, plans, contracts, agreements, bills of sale, delivery records, invoices, receipts, documentation of conveyances, deeds, and other papers.  These records may be in any form such as paper, electronic, or in code.